UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

DANIEL J. ITTEL,                          )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )     CAUSE NO. 2:12-CV-096 JD
                                          )
MICHAEL J. ASTRUE, Commissioner of        )
Social Security,                          )
                                          )
          Defendant.                      )

**<u>OPINION & ORDER</u>**

Claimant Daniel Ittel filed applications for Child's Disability Benefits ("CDB") and

Supplemental Security Income ("SSI") on January 27, 2010, alleging a disability onset date of

October 1, 2006. Ittel's applications were denied initially and on reconsideration. On February 28,

2011, a hearing was held before Administrative Law Judge ("ALJ") Roxanne Kelsey, at which the

Claimant and his father testified in the presence of counsel. An impartial Vocational Expert ("VE")

also appeared. On May 19, 2011, the ALJ issued a decision finding that Ittel was not disabled

because substantial jobs existed in the regional economy which he was able to perform, provided

that he refrained from the substance abuse that has occasionally plagued his medical history. The

Appeals Council denied Ittel's request for review, making the decision of the ALJ the final decision

of the Commissioner of Social Security for purposes of judicial review. See 20 C.F.R. § 416.1481.

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

On March 7, 2012, Ittel filed a Complaint in this Court seeking review of the ALJ's decision.

In an opening brief filed on July 5, 2012, he argued that the ALJ erred in four ways: (1) by making

an unreasonable and unsupported credibility determination; (2) by failing to differentiate between

Ittel's residual functional capacity ("RFC") while abusing drugs and his RFC while not abusing drugs; (3) by failing to incorporate all of Ittel's mental limitations into the RFC; and (4) by improperly analyzing the opinion of "treating physician" Dr. Goldstein. [DE 16]. On October 18, 2012, the Commissioner filed a response. [DE 22]. On December 13, 2012, Ittel replied, and the matter is ripe for adjudication. [DE 27]. For the reasons stated herein, the ALJ's decision is reversed and the case is remanded for further proceedings.

## BACKGROUND

Daniel Ittel is a young man – 24 years old at present. As of the date of the alleged onset of disability, he was 18 years old. [R 141]. He is a high school dropout with a GED. His alleged disability results entirely from mental health issues, and the record shows that his physical health history is not abnormal. More specifically, Ittel has been diagnosed with a learning disability that causes him to struggle with listening comprehension. As a result, he has some difficulty understanding verbal instructions or communicating with other people. [R 43; R 176; R 195; R 233-34; R 358; R 361; R 377; R 455]. He was also diagnosed with Attention Deficit-Hyperactivity Disorder ("ADHD"), which makes it difficult for him to remain focused on tasks or to concentrate, and he is easily distracted. [R 236; R 239; R 295; R 356; R 378; R 382; R 564]. Finally, he has also occasionally, even frequently, exhibited symptoms of depression and bipolar disorder. The medical records on file show a progression of symptoms related to all of these disorders, often exacerbated by Ittel's acknowledged abuse of controlled substances.

## A.    Medical Evidence

On January 8, 2007, state-agency psychologist Dr. J. Gange[1] indicated that Ittel had no medically determinable impairments, mental or otherwise. [R 398]. On October 10, 2007, Dr. Craig Nordstrom, also a state-agency psychologist, conducted a more in-depth consultative examination of Ittel. [R 414-416]. Ittel claimed not to be in psychiatric treatment, and told Dr. Nordstrom that he was not taking psychiatric medication, but he did report that he abused marijuana for about a year when he was sixteen. [R 414]. But Ittel was caught, apparently, and placed on probation, after which he claimed he stopped smoking. Dr. Nordstrom noted that records from a hospitalization in 2003 indicated diagnoses of ADHD and auditory processing problems, as well as a diagnosis of a conduct disorder due to a physical confrontation between Ittel and his brother, which had precipitated the hospitalization. [R 414]. Dr. Nordstrom concluded that it appeared that the symptoms of ADHD were partially remitted with age, and that Ittel's depression symptoms appeared to be in remission as well. [R 416]. He assigned Ittel a Global Assessment of Functioning ("GAF") score of 60.[2]

---

[1] The record does not reflect a prior application for disability. However, as the ALJ noted at the hearing, the evidence, which includes several consultative examinations by state-agency physicians predating Ittel's application for benefits, suggests multiple applications.

[2] Global Assessment of Functioning scores are a psychiatric measure of a patient's overall level of functioning. *See* American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, TEXT REVISION ("DSM") 34 (4th ed. 2000). Higher scores indicate better functioning, and lower scores indicate greater limitations and impairments. The score ranges are outlined below (as taken from the DSM and reproduced at http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning):

| | |
|---|---|
| 91 - 100 | No symptoms. Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. |
| 81 - 90 | Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members). |
| 71 - 80 | If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). |

On October 30, 2007, Dr. B. Randal Horton, yet another state-agency psychologist, concluded that Ittel had ADHD in partial remission. [R 430]. Dr. Horton ruled out a learning disability, however, and concluded that Ittel was capable of employment involving simple, repetitive tasks. [R 430]. In support, he cited Ittel's extensive and varied daily activities, which included playing music with friends, playing video games with friends, engaging in other social functions, driving, writing, composing music, reading, using computers, skateboarding, playing sports, sustaining normal conversations, cleaning, cooking, doing laundry, and shopping. [R 430]. Dr. Horton also concluded that Ittel did not meet any listing, although he did show moderate limitations in some areas of social functioning and in maintaining concentration, persistence, or pace. [R 428-

| 61 - 70 | Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. |
|---|---|
| 51 - 60 | Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). |
| 41 - 50 | Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). |
| 31 - 40 | Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). |
| 21 - 30 | Behavior is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends) |
| 11 - 20 | Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). |
| 1 - 10 | Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death. |
| 0 | Inadequate information. |

29; R 442]. He noted Ittel's history of inpatient psychiatric stays (but attributed the stays to family dysfunction) and noted that Ittel was currently participating in many social activities; that he was not currently receiving psychiatric medication or treatment; and that his overall level of functioning was good. [R 444].

The next set of records shows a turn for the worse, seemingly due to substance abuse. On October 27, 2008, Ittel was admitted to the inpatient care center at Porter-Starke Services for a 72-hour detention. [R 573]. He had previously been brought to the Porter County Jail and placed in restraints, and he was acting "erratic" while detained. [R 573-576]. He was eventually charged with disorderly conduct and resisting arrest as a result of the incident. [R 576]. Upon evaluation at Porter-Starke Services, Ittel denied auditory or visual hallucinations, but reported that his thoughts were racing. [R 573]. He acknowledged recent use of LSD, and admitted to having used LSD twice before, along with more frequent use of a variety of other hallucinogenic drugs, including large quantities of allergy medication (up to 60 pills a day), some sort of hallucinogenic seed, and acid. [R 574, 576]. He also admitted to smoking marijuana daily for about three years. Treatment notes opined that "the recent use of acid or LSD may have been the precipitant to this current episode." [R 574]. Treatment notes also show that Ittel's mother reported that Plaintiff had recently quit school and moved in with his father, and that she did not believe this to be in Ittel's best interests "because his father was using drugs with him and introduced him to other drugs." [R 575].

On April 13, 2009, state-agency psychologist Dr. Virginia Mullen examined Ittel. [R 583-84]. She noted that his history showed a diagnosis of a learning disability and ADHD, and that he had been hospitalized in the past. [R 583]. She gave him a GAF score of 45, indicative of serious symptoms or serious impairments in functioning. Ittel told Dr. Mullen that he watched about four

hours of television a day, played video games and played guitar. [R 583]. He reported doing his own laundry, shopping, washing dishes, and taking out the garbage. At the time of the examination, he denied drug and alcohol use, and reported that he was taking Cyprexia and Ritalin pursuant to prescription. [R 584].

On April 21, 2009, Dr. Stacia Hill, also a state-agency psychologist, opined that Ittel had moderate limitations in attention and concentration, but could still do simple tasks. [R 601]. She further indicated that he could perform repetitive tasks on a sustained basis. She noted that Ittel had mild restrictions in the activities of daily living, mild limitations in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. [R 595].

On August 6, 2009, Ittel's condition took another negative turn. Ittel reported to Porter-Starke Services after being charged with unlawful entry and intimidation. [R 607]. Ittel informed Dr. Mitchell Goldstein, M.D., a psychiatrist with whom he would visit several times, that a woman had taken out a restraining order against him. [R 607]. Ittel denied hallucinations, denied paranoia, denied any suicidal or aggressive thoughts or ideations, and reported that he had no mood problems. He did, however, feel that he needed to stop using alcohol. [R 607]. Dr. Goldstein diagnosed Ittel with alcohol abuse in addition to the diagnoses previously in his record, but noted that he claimed he was no longer drinking. [R 608]. He gave Ittel a GAF score of 45, and referred him out to therapy.

On September 5, 2009, Ittel's father brought him to Porter-Starke again after calling the police regarding "wild, erratic behavior." [R 610]. Drug screening revealed that Ittel was positive for benzodiazepines, which are psychoactive drugs, and marijuana. [R 610]. Ittel presented as

delusional, and his mother told Dr. Goldstein that he was living with his father again for the past month or so. Before that, according to Ittel's mother, the claimant's behavior was not like this. [R 610]. Dr. Goldstein also recorded one past suicide attempt, a detail which did not appear in previous reports, and a history of violence/assaults towards others. [R 610]. Dr. Goldstein diagnosed severe bipolar disorder with psychotic features, cannabis abuse, and sedative-hypnotic abuse in addition to his earlier diagnoses. [R 611-12]. Dr. Goldstein assessed the situation in stark terms: "Patient is clearly psychotic." [R 612]. He prescribed Seroquel XR and convinced Ittel to undergo inpatient treatment. His GAF score at the time was 25, which is exceptionally low. [R 612]. Inpatient treatment and medication led to progress. On the date of discharge, September 22, 2009, a progress note completed by Dr. John Savij, M.D., noted that Ittel was awake and alert; his speech was clear, and his mood was stabilized. [R 630]. He denied any auditory or visual hallucinations, denied paranoia, and denied any active self-injurious or suicidal thoughts. [R 630].

On a January 11, 2010, visit to Porter-Starke for panic attacks, Ittel told Dr. Goldstein that his last glass of wine was a month before, but that he had recently used marijuana. [R 635]. Ittel was on probation at the time, and Dr. Goldstein pointed out to him the risk of drug use while on probation. [R 635]. Ittel attended several follow-up appointments with Dr. Goldstein. In February of 2010, he denied using marijuana in the prior three weeks. [R 638]. At the same visit, Ittel's father told Dr. Goldstein they had applied for disability benefits because they could not afford the Seroquel. [R 636].

After a March 11, 2010, visit [R 645], Dr. Goldstein filled out a more extensive "report of psychiatric status." [R 643]. He noted that Ittel had visited the clinic seven times between August of 2009 and March of 2013. [R 643]. He diagnosed Ittel with bipolar affect disorder (most recent

episode mixed), severe with psychotic features; alcohol abuse; cannabis abuse; and sedative-hypnotic abuse, and he assigned him a GAF score of 50. [R 643]. Dr. Goldstein noted that Plaintiff was currently compliant with his medication, was not stressed and was responding to medication. [R 646]. That said, Dr. Goldstein listed as "current specific manifestations of the mental disorder" erratic behavior; talking to self; auditory hallucinations; periods of disturbed sleep; depression; and manic behaviors. [R 644]. The form that Dr. Goldstein completed asked him to describe Ittel's limitations, but Dr. Goldstein identified no limitations. [R 647]. He also noted that he could provide minimal examples of Ittel's distractability due to the limited nature of his sessions with Ittel [R 644], that Ittel's attention was limited at times [R 645], and that Ittel's only side effects were weight gain [R 648] and occasional bouts of shakiness/anxiousness. [R 647]. Subsequent treatment notes documented that Ittel continued to report not using alcohol and marijuana, and that his prognosis was improved. [R 651; R 660-61].

On March 24, 2010, state-agency examiner Dr. Horton provided another opinion. [R 666-679; R 680-683]. Dr. Horton opined that with compliance with his proscribed medication and continued sobriety Ittel would be able to perform work involving simple, repetitive tasks. [R 682]. He noted that Ittel was mildly limited in the activities of daily living, and had moderate limitations in maintaining social functioning and maintaining concentration, persistence, and pace. [R 676]. On April 29, 2010, Dr. William Shipley reviewed the record and affirmed Dr. Horton's opinion. [R 698].

Dr. Goldstein completed a second report on February 10, 2011. [R 701-706]. Again, he diagnosed Ittel with bipolar I disorder, most recent episode depressed, and with psychotic symptoms; cannabis abuse, in remission; and sedative-hypnotic abuse, deferred. [R 701]. He described Ittel's

thought process as vague or distracted [R 702], but noted that his memory was good [R 703], that his thought process was concrete, and that his concentration and effort seemed good. [R 704]. As "current specific manifestations of the mental disorder," Dr. Goldstein listed depression, and auditory hallucinations pertaining to religion. [R 702]. He noted that Ittel said he knew he had to "fight the voices" but did not want to do so. [R 702]. And though Dr. Goldstein noted that Ittel's memory was good, he opined that Ittel was "not able to relate[] well or be productive." [R. 703-705]. Dr. Goldstein assigned Ittel a GAF score of 50. [R 701].

## B. The Administrative Hearing

### 1. Testimony of the Claimant

The ALJ conducted a video hearing on Ittel's benefits applications on February 28, 2011. Daniel Ittel testified at the hearing, as did an impartial vocational expert. Ittel testified that he lived with his father and that he had a driver's license and was able to drive. [R 44-45]. He testified that he had a dog and was partially responsible for the dog's feeding and walking. [R 45]. He stated that he had worked for a friend in the summer of 2009 laying bricks for a contractor, but that he did not get paid for his work. [R 41-42]. Ittel stated that he sits at home and watches television on a normal day, listens to music, and plays video games. [R 46]. He also testified that he could cook meals for himself, including cooking fish or meatloaf for dinner. [R 46]. He stated that he did not perform many household tasks, but did wash the dishes and clean his room. [R 47]. He also stated that he gets together with friends occasionally and goes to church with his father almost every Sunday. [R 47-48]. He stated that he could follow stories on television, had no trouble dealing with receptionists at doctors' offices, remembers to take his medicine, and generally remembers to go to his doctors' appointments. [R 48].

When asked why he is unable to work, Ittel replied that he has "no ability to focus." [R 43]. He also explained that he does not know how to talk to people, that he cannot understand certain small things, and that even the simplest things are a huge task for him. [R 44]. He could not explain in more detail, despite the ALJ's prompting. [R 44]. Ittel also testified that he has auditory hallucinations anywhere from 20-30 times a day. [R 51].

Ittel testified that the last time he had used alcohol was over a year before and that his previous use had been rare. [R 48]. When asked the largest number of drinks he had consumed in one day since his alleged onset date, he initially responded that he did not know, but then cited a party between 2006 and 2008 at which he "probably drank about 20 drinks." [R 48-49]. He stated that he did not attend parties anymore after he was put on probation for drinking and threatening a girl. [R 49]. When asked what other drugs he had used, Plaintiff admitted to using marijuana, vicodin, and allergy medicine. He claimed that the last time he had used marijuana was 13 months prior to the hearing, in early 2010, and that at the time he was using about an ounce every week or two. [R 50]. He stated that an ounce was the equivalent of about 20 marijuana joints.

2.    *Testimony of the Claimant's Father*

The Claimant's father testified that, since Ittel turned 18, he had started having longer bouts of confusion that included not knowing who he was and difficulty with communication. [R 56]. He admitted that Ittel was able to "maintain" on his current medication, however, though he stated that it made him drowsy and confused at times. [R 56]. He contradicted Ittel's testimony about performing household chores. [R 57]. He also testified that he did not believe that Ittel could keep a job because when he gets frustrated or loses interest in a task he walks away from it. [R 59].

### 3. Testimony of the Vocational Expert

John Grenfell, a Vocational Expert, testified at the hearing. [R 59-65]. The ALJ asked the VE two hypotheticals. First:

> Hypothetical number one, the individual has difficulty concentrating, but would be able to do simple, unskilled tasks. He would also be limited to no more than brief and superficial contact with coworkers, supervisors or the general public. Are there any jobs such an individual could do?

[R 60]. The VE responded that, under the Dictionary of Occupational Titles ("DOT"), simple, unskilled work activity corresponded to Specific Vocational Preparation ("SVP") levels of 1 or 2, and that a considerable number of jobs existed at the light, unskilled level that would involve simple tasks and only brief contact with coworkers or the public. [R 60]. These jobs included a car detailer, DOT 915.687-014, for which there were 150,000 jobs in the national economy and 3,000 in the Chicago-area regional economy; a sorter, DOT 573.687-034, for which there were over 30,000 jobs in the national economy and over 400 in the regional economy; a street cleaner, DOT 955.687-018, for which there were over 30,000 jobs in the national economy and over 400 in the regional economy; and various poultry industry jobs including boner, DOT 525.687-066, for which there were over 200,000 jobs in the national economy and 4,000 in the regional economy. [R 60-61].

Next, the ALJ asked a second hypothetical:

> For hypothetical number two, if the individual cannot understand, carry out or remember even simple instructions or respond appropriately to supervisors, coworkers in a work situation or deal with people in a routine work setting, would there be no jobs for this individual?

[R 61]. The VE confirmed that there would be no jobs available.

## C. The ALJ's Decision

The ALJ's decision was issued on May 19, 2011. It follows a parallel structure. First, the

ALJ proceeds through the five-step process while considering Ittel's work ability *with* his substance abuse issues. [R 18-26]. Second, the ALJ separately proceeds through the five-step process to consider Ittel's work ability *without* the substance abuse issues [R 26-30], and with some cross-referencing contained therein.

In the first half, the ALJ found that Ittel suffered from several severe impairments – a learning disorder, depression, social phobia, and a history of marijuana and alcohol abuse – but that none of those rose to the listing level. [R 21-25]. While considering those mental limitations, the ALJ found that Ittel suffers from mild restrictions in daily living; marked difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence and pace. [R 25]. She next concluded that Ittel has the RFC:

> to perform a full range of work at all extertional levels but with the following non-exertional limitations: he is unable to respond appropriately to supervisors, co-workers, and usual work situations with the documented substance use disorder.

[R 25]. The ALJ concluded that no jobs exist which Ittel could perform with that RFC.

The ALJ then turned to analyzing Ittel's ability to work, *not* including his substance abuse disorders. She found that the Claimant's learning disorder, depression, and social phobia would still constitute a severe impairment, but that impairment (being less significant than before) would still not meet a listing. [R 26]. That said, the ALJ did find mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. [R 26]. She next concluded that, without drug abuse, Ittel has the RFC:

> to perform a full range of work at all extertional levels but with the following non-exertional limitations: he is limited to simple, unskilled work tasks involving only brief, superficial contacts with co-workers, supervisors, and the general public.

[R 27]. In formulating this second RFC, the ALJ found some of the Claimant's statements concerning his symptoms not credible based on alleged inconsistencies with the record. [R 28]. She also dealt with Dr. Goldstein's reports – the most extensive in the record – in a very cursory manner. [R 29]. In the end, the ALJ found that a person with Ittel's non-drug-abusing RFC could perform jobs existing in the number cited by the VE in response to the first hypothetical. She found Ittel not disabled. The discerning reader will have noticed that the difference between Ittel's mental limitations *with* drug abuse and his mental limitations *without* drug abuse boils down to a "downgrade" from marked to moderate difficulties with social functioning; everything else stayed the same. But that was apparently the difference between disability and the lack thereof. More detail about the ALJ's opinion is included where necessary throughout the discussion section of this opinion.

## STANDARD OF REVIEW

The Commissioner's final decision in this case is subject to review pursuant to 42 U.S.C. § 405(g), as amended, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399-400. As a result, the Court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Even

if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ is not required to address every piece of evidence or testimony presented, but she must provide "an accurate and logical bridge" between the evidence and her conclusions. *Roddy v. Astrue*, __ F.3d __, 2013 WL 197924 at *5 (7th Cir. 2013). Conclusions of law, unlike conclusions of fact, are not entitled to deference. If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## DISCUSSION

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the Claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the Claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The five step process asks:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the Claimant is performing substantial gainful activity (step one) the Claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the Claimant does not have a severe medically determinable impairment or a combination of impairments that is severe and meets the duration requirement (step two), then the Claimant will likewise be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the Claimant is not performing substantial gainful activity ("SGA") and does have a medically severe impairment, however, the process proceeds to step three. At step three, if the ALJ determines that the Claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, if a listing is not met or equaled, then in between steps three and four the ALJ must assess the Claimant's "residual functioning capacity" ("RFC"), which, in turn, is used to determine whether the Claimant can perform her past work (step four) and whether the Claimant can perform other work in society (step five). 20 C.F.R. § 404.1520(e). The Claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the Claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In this case, Ittel has alleged four different errors (rearranged herein for ease of discussion):

(1)    Ittel argues that the ALJ's credibility determination – more specifically, finding Ittel not credible with respect to those portions of his testimony which conflicted with the RFC determination – was flawed;

(2)    Ittel argues that the ALJ failed to handle Dr. Goldstein's reports properly in accordance with the "treating physician rule;"

(3)    Ittel argues that the ALJ did not properly analyze the effect of his substance abuse; and

(4)    Ittel argues that the ALJ's RFC analysis failed to incorporate all of the mental limitations which the RFC found.

The Court agrees with Ittel; the ALJ erred in each of the ways indicated. Each is discussed in turn.

## A.    Whether the ALJ's Credibility Determination was Flawed

Since the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset so long as it finds some support in the record and is not patently wrong. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Indeed, "[o]nly if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (internal quotation omitted). SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). However, an ALJ's credibility findings need not specify which statements were not credible. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). The Court should give the ALJ's opinion a "commensensical reading," rather than "nitpick . . . for inconsistencies or contradictions[.]" *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

The process for evaluating a claimant's symptoms has two major steps. First, the applicant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(a), (b). In Ittel's case, the ALJ found that his medically determinable impairments, even absent drug abuse, could reasonably be expected to produce the symptoms alleged. [R 28].

Second, the ALJ must then evaluate the intensity, persistence, and limiting effects of the

individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(a). When any statements by the Claimant regarding his symptoms are not substantiated by the medical evidence, the ALJ must assess the credibility of those statements. An ALJ may not reject subjective complaints of pain *solely* because they are not fully supported by medical testimony, although that may be probative of the applicant's credibility. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Still, since "applicants for disability benefits have an incentive to exaggerate their symptoms[,]" an ALJ is "free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).

In her credibility decision in this case, the ALJ stated the following:

> [T]he [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

[R 28]. The ALJ then began a second, explanatory paragraph by reiterating that the alleged severity and debilitating nature of the Claimant's subjective complaints were not fully credible. [R 28]. She stated that Ittel's testimony about his symptoms was not credible "in light of the medical evidence," and that "[c]linical findings and test results are not consistent with the allegations of disabling symptoms." But the ALJ only developed one such inconsistency with any reference to the record.

Ittel testified at the February 28, 2011, administrative hearing that he had stopped using alcohol and drugs roughly a year and a month prior [R 48-50], and the ALJ found his testimony to be true. [R 28]. In making her credibility finding, the ALJ noted that Ittel also said, at the hearing, that he was still experiencing auditory hallucinations. [R 28]. But, according to the ALJ, "after he stopped using substances he denied experiencing hallucinations[.]" As support, the ALJ cited Dr.

Goldstein's March 11, 2010, report, supposedly claiming that Ittel was not experiencing hallucinations at that time. [R 24; R 28]. The problem with this basis for the credibility finding is that it is simply not true. In the March 11, 2010, report, Dr. Goldstein wrote "auditory hallucinations" in the section titled "*current* specific manifestations of the mental disorder," a section intended to include "the *current* objective signs and symptoms which justify the diagnosis[.]" [R 644]. He did the same again a year later. On February 10, 2011, Dr. Goldstein wrote, "Daniel is depressed and he is hearing voices about religion (auditory hallucinations). He states that he knows he needs to fight voices but 'I don't want to.'" [R 702]. He wrote those words, once again, in the "current specific manifestations" section. The ALJ cited Dr. Goldstein's reports as evidence that the hallucinations *stopped* after Ittel stopped using drugs. In fact, Dr. Goldstein's reports are very clear evidence that the hallucinations *continued* after Ittel stopped using drugs.

To say that a Claimant's statement is not credible because it is inconsistent with a piece of medical evidence, when it is in fact completely consistent with that piece of medical evidence, is "patently wrong." *Craft*, 539 F.3d at 678. It is unreasonable to base a credibility finding on a demonstrably inaccurate view of the medical evidence. *Prochaska*, 454 F.3d at 738. Whether or not the other minor inconsistencies were accurate – that the Claimant testified as to drowsiness as a side effect without substantiation in the medical record, for example – this Court cannot say how a proper understanding of the record with respect to hallucinations would have affected the ALJ's credibility determination. It is a substantial enough error to require a remand.

**B.    Whether the ALJ Handled Dr. Goldstein's Reports Consistent with the "Treating Physician Rule"**

Disability cases typically involve three types of physicians: 1) a treating physician who regularly provides care to the Claimant; 2) an examining physician who conducts a one-time

physical exam of the Claimant (in this case, there are many of these); and 3) a reviewing or non-examining physician who has never examined the Claimant, but read the Claimant's files to provide guidance to an adjudicator. *See Giles v. Astrue*, 433 Fed.Appx. 241, 246 (5th Cir. 2011). The opinion of the first type, a "treating physician," is ordinarily afforded special deference in disability proceedings. The regulations governing social security proceedings instruct claimants to that effect:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). When the treating physician's opinion is *not* entitled to controlling weight, however – such as where it is not supported by the objective medical evidence, where it is inconsistent with other substantial evidence in the record, or where it is internally inconsistent, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)) – then the ALJ should move on to assessing the value of the opinion in the same way he would any other medical evidence:

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.

20 C.F.R. § 404.1527(c)(2). In summary, in assessing what weight to give a treating source statement, the ALJ must proceed step-by-step. First, the ALJ asks whether the treating source statement is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and . . . not inconsistent with the other substantial evidence in [the] case record[.]" § 404.1527(c)(2). If it is, it must be given "controlling weight." If it is not, however, the ALJ must ask just how much weight to give it relative to the other record evidence, guided by the factors listed at §§ 404.1527(c)(2)(i)-(ii) and §§ 404.1527(c)(3)-(6).

Dr. Goldstein indisputably was Ittel's treating physician. Furthermore, the reports he provided on March 11, 2010, and February 10, 2011, do qualify as the sort of opinion which a medical source may give. *See* 20 C.F.R. § 404.1527(a)(2) (the term "medical opinion" includes, *inter alia*, "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis[.]"). That means the Dr. Goldstein reports were "opinions from [Ittel's] treating sources[,]" and were entitled to controlling weight under 20 C.F.R. § 404.1527(c)(2) unless the ALJ minimally articulated supportable reasons for failing to accord that weight. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skarbek v. Astrue*, 390 F.3d 500, 503 (7th Cir. 2004). The ALJ's opinion dealt with the Dr. Goldstein reports in a conclusory fashion:

> For the most part, the opinions offered by Dr. Goldstein on February 10, 2011, are reflective of [C]laimant's functional status without substance use. The purported degree of lack of attention is overstated. The [C]laimant drives a car, plays video games, watches television, and prepares food for himself. He was trying to learn to play guitar. With medication, [C]laimant's attentiveness improves significantly and he can pay attention and is more productive. The alluded to minimal stress tolerance is discounted, seeing as the act of pleading guilty in a criminal court would be much more stressful than normal workplace stressors. Ever since [C]laimant was charged and placed on probation back in February 2010, or thereabouts, he was fearful that he would not be able to comply with the terms of his probation. The opinions of Dr. Goldstein are supported only to the extent (without substance use) [C]laimant has severe mental impairments limiting him to simple, unskilled work.

[R 29]. The problem with this analysis is that the ALJ did not discuss, at all, whether Dr. Goldstein's opinion should be afforded controlling weight. Rather than first resolve *that* issue, and only then

proceed to weighing the opinion like any other evidence, the ALJ appears to have skipped straight to the second step. On the current record, it is not clear whether the ALJ considered the issue of controlling weight – perhaps off the record – and then decided that Dr. Goldstein's opinion did not deserve it, or whether the ALJ simply failed to recognize the applicability of the treating source rule. It is true that the ALJ need only "minimally articulate" his reasons for not giving a treating source statement controlling weight, *see Schmidt*, 496 F.3d at 842, and that when an ALJ does so, this Court will ask only whether the reasons she articulated are supported by substantial evidence. But when the ALJ fails to articulate his reasons for denying controlling weight at all, this Court has no place to start its review. As a result, this issue, too, warrants remand.

## C.       Whether the ALJ Properly Analyzed the Effect of Ittel's Substance Abuse

Congress has eliminated alcoholism or drug addiction as a basis for obtaining social security benefits: "[A]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *See* 42 U.S.C. § 1382c(a)(3)(J); *see also* 20 C.F.R. § 416.935. In other words, the inquiry for the ALJ is whether "were the applicant not a substance abuser, [he] would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628–29 (7th Cir. 2006) (citing 20 C.F.R. § 416.935); *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003); *Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001). The Claimant bears the burden of proving that alcoholism or drug addiction is not a contributing factor. *Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010); *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).

The Court sees no error in the way, structurally speaking, that the ALJ went about

"disentangling" Ittel's symptoms with drug abuse from his symptoms without drug abuse. To proceed through the five-step disability determination process separately for each condition, as the ALJ did, is likely the most logical and effective way to satisfy the statutory directive. But while the Court finds no new, independent error with respect to this issue, the same substantive error that impaired the ALJ's credibility determination infects the process of separating drug use symptoms from non-drug use symptom. It is plain from the ALJ's opinion [R 28] that she considered the symptom of auditory hallucinations to have occurred when Ittel used drugs, and to have stopped occurring after he stopped using drugs. Thus, that symptom was placed into the "with drugs" category, so to speak. But as this Court has already pointed out, the records on which the ALJ relied show that the Claimant has, in fact, experienced hallucinations since he stopped using drugs. If the ALJ had acknowledged that and explained why she disregarded those reports, that would be one thing. But instead, the ALJ cited those reports for the opposite of what they actually contain. Accordingly, the results, if not the process, of the ALJ's attempt to properly analyze the effect of Ittel's substance abuse were flawed, and this issue deserves further consideration on remand.

**D.      Whether the RFC Failed to Incorporate All of the Claimant's Mental Limitations**

The ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not

ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Most important in this case, "[a]n ALJ must take into account an applicant's mental limitations when determining the RFC." *Hill v. Astrue*, 295 Fed.Appx. 77, 83 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(c); *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008)).

In determining Ittel's RFC without drug use – which is the relevant RFC for purposes of determining disability – the ALJ found that Ittel suffered from mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. [R 26]. But the RFC determination simply limited Ittel to "simple, unskilled work tasks involving only brief, superficial contacts with co-workers, supervisors, and the general public."

Neither of those limitations accounts for limitations on concentration, persistence, and pace. The Social Security Administration has explained: "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85–15; *see also Craft*, 539 F.3d at 677 (quoting same). In the Seventh Circuit, at least, limiting a Claimant to "unskilled" work is not an adequate proxy for specifically acknowledging his limitations in concentration, persistence and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010); *see also Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009) (limiting hypothetical to simple, routine tasks did not account for limitations of concentration, persistence and pace); *Craft*, 539 F.3d at 677–78 (restricting hypothetical to unskilled work did not consider difficulties with memory,

concentration or mood swings). Neither is a limitation to only "brief, superficial contacts" with others. That is a reflection of Ittel's issues with social functioning, an area in which the ALJ also found moderate limitations. [R 26]. The ability to function in social settings and navigate workplace social interactions is very different from the ability to concentrate on individual work with a certain degree of success and productivity, and accounting for a limitation in the former area does not necessarily alleviate difficulties in the latter area. It was an error for the ALJ to fail to include the mental limitation with respect to concentration, persistence, and pace in the RFC.

That said, there is an interesting wrinkle to this case. Failures to include limitations like this in the RFC are problematic largely because that omission usually leads to the ALJ neglecting to include the limitations in the hypotheticals she poses to the VE, which, in turn, means that the final job figures produced by the VE might not correlate to a Claimant's full suite of limitations. *See generally O'Connor-Spinner*, 627 F.3d 614. But the ALJ in this case *did* account for limitations in concentration, persistence, and pace in her first hypothetical to the VE. In addition to the limitations on social interactions and the limitation to unskilled work, she told the VE to consider an individual who "has difficulty concentrating[.]" [R 60]. Thus, even though the ALJ's RFC finding did not incorporate that aspect of the Claimant's mental limitations, the hypothetical posed to the VE – and therefore the job figures on which the ALJ finally relied – did. This set of facts therefore presents an unusual "harmless error" type of question, and if the mental RFC issue was the only problem with the ALJ's decision, the Court might hesitate to remand. Given the other reasons for remanding the case, however, the Commissioner is encouraged to take the opportunity to correct the RFC so that it is fully compatible with the hypothetical and the remainder of the ALJ's findings.

**CONCLUSION**

For the reasons stated herein, the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings.

SO ORDERED.

ENTERED:   February 26, 2013

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court